**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **THEODORE J. GERARDI** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 4:05-CV-183-Y** |
| | § | |
| **CITY OF WATAUGA, TEXAS** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the Court is Defendant's motion for summary judgment [doc. # 35], filed December 22, 2005. After consideration of the motion, the response, and the reply, the Court GRANTS the motion.

## I. BACKGROUND

Plaintiff Theodore J. Gerardi was hired as a public-safety officer by defendant City of Watauga, Texas ("the City"), in 1982. On his employment application, Gerardi stated that he had never been arrested, detained by police, or summoned into court. The application warned that any willful misrepresentations, omissions, or falsifications could be grounds for immediate dismissal. (Def.'s App. at 2.)

In August 2004, City Manager Kerry Lacy determined that the City should begin to conduct criminal-background checks on all employees of the City's Department of Public Safety ("DPS"). Lacy asked Lieutenant Philip Adams to instruct David Shertzer, the communications director, to perform background checks on all public-safety officers in the DPS. The checks revealed that five of the DPS employees had evidence of criminal conduct on their records. Of

those five, Gerardi was the only DPS employee whose criminal conduct occurred before his employment and who failed to disclose his criminal record on his employment application.[1] Because DPS had just hired David Van Laar to be the new DPS director, Lacy decided to allow Van Laar to make the decision what disciplinary action should be taken. In September, Lacy gave Van Laar a copy of Gerardi's personnel file, which included Gerardi's employment application and the results of the criminal-background check, and told Van Laar that he need to make a decision on how to proceed. (Def.'s App. at 29-30.)

On October 12, 2004, Van Laar held a closed meeting between himself and the City's public-safety officers to allow the officers to express any concerns and ask questions. During the meeting, Gerardi asked Van Laar how he was going to handle problems with his command staff: "Chief by this time you should be aware that your entire command staff is comprised primarily of a pack of thieves and liars. We are wondering what you intend to do about that, and if so, when?" (Def.'s App. at 71.) Gerardi asserts that Van Laar turned red, looked down, paused for about six minutes, looked up angrily, and told Gerardi that they could discuss his statement later. (Pl.'s App. at 71.) Van Laar states that he merely told Gerardi that he would discuss the matter with him later in private. (Def.'s App. at 2.) Gerardi asked Van Laar if he was approachable, and Van Laar said he was. Gerardi then asserted that the officers should be protected from bad publicity:

> Chief, you have the opportunity, walking into a department that has a tremendous amount of talented people. They go out into this community and they do their jobs day in and day out, and for the most part, we are being berated by that same community because of newspaper articles that's just blasting us, and it's unfair

---

[1] The check revealed that Gerardi had been arrested in 1970 for theft and in 1972 for impersonating a police officer and defrauding an innkeeper. (Def.'s App. at 24.)

that the people causing us to be blasted in the paper are the – are the ones that keep making the same mistakes and that come to work every day and get in their carpeted offices without any windows and don't have to take the abuse from the public that we're taking, and it's not fair.  (Pl.'s App. at 71.)

Van Laar told Gerardi that it was his job to deal with any negative publicity.  Gerardi disputed this:  "No sir, it is not our job . . . we have to keep our business straight . . . we have to protect the best image that we know how with the tools that we have."  (Pl.'s App. at 74.)  Van Laar did not respond and moved on to the next question.

On October 18, Van Laar called a meeting with Clifton Beck,[2] Adams, and Gerardi to discuss Gerardi's nondisclosure of his criminal record.  Van Laar told Gerardi about the problem with his nondisclosure in his employment application, that such failure was grounds for discharge, and that Gerardi had ten days to state in writing why he had failed to disclose his prior criminal record.  Gerardi claims that he tried to discuss his comments from the October 12 meeting with Van Laar, but that Van Laar would not allow it.  (Pl.'s App. at 73, 78.)  Seven days later, Gerardi gave Van Laar a letter, explaining that at the time he completed his application, Bill Keating[3] told him to indicate that he had no criminal history.  (Def.'s App. at 26.)  When the City's attorney, Mark Daniel, contacted Keating to verify Gerardi's story, Keating vigorously denied telling Gerardi to falsify his application.  (Def.'s App. at 46.)  After Daniel told Van Laar of the denial, Van Laar decided to fire Gerardi.  (Def.'s App. at 5.)

On October 28, Van Laar called Gerardi to his office and told him that his employment was being terminated effective November 1, 2004, but that he could resign by 10:00 a.m. the next day.  (Def.'s App. at 5-6.)  Gerardi asserts that he again tried to discuss his previous

---

[2]Beck was the human-resources director for DPS.

[3]In 1982, Keating was a captain with the DPS and was later named chief.

3

comments about DPS's command staff, but that he was rebuffed.  (Pl.'s App. at 78.)  Van Laar claims that Gerardi never approached him after the October 12 meeting to discuss his comments. (Def.'s App. at 6.)  The next day, Gerardi submitted a written notice of retirement, effective November 1, 2004.  (Def.'s App. at 28.)

On January 10, 2005, Lacy received a letter from Gerardi's lawyer stating that Gerardi was seeking reinstatement and wanted to invoke the appellate procedures provided for in the City's personnel manual.  (Def.'s App. at 34.)  On January 18, Daniel informed Gerardi's counsel that there were no appellate procedures applicable to an employee who had resigned; thus, there would be no appellate-review hearing.  (Def.'s App. at 48.)  On February 2, Gerardi filed suit against the City, alleging violations of the Texas Whistleblower Act and of his right to free speech under the United States and Texas Constitutions.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  But the moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof.  Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim.  *See id.* at 323-25.

When the moving party has carried its summary judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to

4

interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In making its determination on the motion, the Court must look at the full record in the case. FED. R. CIV. P. 56(c); *see Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

## III. DISCUSSION

### A. FIRST-AMENDMENT CLAIM

Gerardi asserts that the City unlawfully fired him in retaliation for exercising his constitutionally-protected, first-amendment rights during the October 12 meeting. Section 1983 provides a civil remedy in federal court for violations, under color of state law, of a person's constitutionally recognized rights, privileges, or immunities. *See* 42 U.S.C.A. § 1983 (West 2003); *see Findeisen v. N. E. Indep. Sch. Dist.*, 749 F.2d 234, 236-37 (5th Cir. 1984). Municipal liability under § 1983 requires proof of (1) an official policy or practice or an isolated decision

by a policymaker who is vested with final policymaking authority and (2) a violation of constitutional rights whose moving force is the policy or custom. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). In its response, Gerardi does not argue that there was an official policy or practice; thus, this Court will focus on whether there was an isolated decision by an authorized policymaker.

To invoke § 1983 liability, an isolated decision must be made by an authorized policymaker in whom final authority rested regarding the action ordered. *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002). Thus, Gerardi must prove that Van Laar, as the employee who made the decision to fire him, was vested with final policymaking authority over such a decision. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986) (plurality op.).

Gerardi has produced no evidence to show that Van Laar held final policymaking authority over the decision to fire Gerardi. The City's charter states that all determinations of policy matters are vested in the city council and further vests the council with authority to establish qualifications, rules, and standards for all city employees. (Def.'s App. at 41-42.) All of the City's policies regarding the termination of city employees are in the City's personnel manual. (Def.'s App. at 6, 31.) A department head—such as Van Laar—could supplement a personnel rule, but approval must be given by the city manager. (Pl.'s App. at 9.) The personnel manual provides that disciplinary action is the responsibility of the immediate supervisor. (Def.'s App. at 36.) The city manager has the final authority to fire any employee of the City.[4]

---

[4]Gerardi argues that Lacy's authority as city manager to fire Gerardi imposes municipal liability. But, Lacy did not make the decision to fire Gerardi.

(Pl.'s App. at 6.)  Although Van Laar may have had the discretion to fire Gerardi, this does not give rise to municipal liability based on the exercise of that discretion.  *See Pembaur*, 475 U.S. at 481-83 & n.12.  Van Laar was not responsible for establishing final governmental policy regarding firing DPS employees; thus, he did not have final policymaking authority.  *See id.* Although a governmental body can delegate policymaking authority, evidence that Van Laar had discretion falls short of showing the required level of delegation.  *See Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984).  There is no evidence that the council delegated any authority to Van Laar to set goals and to structure and design the termination policies of DPS employees. *See id.*  Thus, imposing municipal liability on the City would be inappropriate in these circumstances.[5]

## B. WHISTLEBLOWER CLAIM

Gerardi asserts the City unlawfully fired him in retaliation for reporting violations of the law.  To prevail on a retaliation claim under the Texas Whistleblower Act, a plaintiff must allege that (1) the plaintiff was a public employee, (2) the plaintiff acted in good faith in making a report, (3) the report involved a violation of law by the agency or a public employee, (4) the report was made to an appropriate law-enforcement authority, and (5) the plaintiff suffered retaliation for making the report.  TEX. GOV'T CODE ANN. §§ 554.002(a) (Vernon 2004).  To timely bring such a claim, an alleged whistleblower must bring suit no later than the 90th day after the date on which the alleged violation either occurred or was discovered by the employee

---

[5]Although this ground alone is sufficient to find the City is entitled to summary judgment on Gerardi's First-Amendment claim, the arguments raised by the City regarding the lack of public concern in Gerardi's statements are compelling. Summary judgment would likewise be appropriate on this basis.

through reasonable diligence.  *Id.* § 554.005 (Vernon 2004).  The period is tolled during the time that the employee initiates action under the grievance or appeal procedures of the employing governmental entity.  *Id.* § 554.006(c) (Vernon 2004).  Here, the parties agree that Gerardi's limitations period began on October 28, 2004, and that Gerardi filed suit 97 days later on February 2, 2005.  Gerardi asserts that the limitations period was tolled during the eight days he attempted to appeal his constructive discharge.  The City argues, however, that this attempt to appeal Gerardi's resignation was ineffective to toll the limitations period because the grievance procedures were inapplicable to an employee who resigned.

The City's grievance procedures were clear:  an employee may appeal a termination decision.  There was no grievance procedure for an employee who resigned.  (Def.'s App. at 38, 48.)  There is no ambiguity in the grievance procedure.  Gerardi cannot create an ambiguity by unilaterally invoking a nonexistent grievance procedure.  *Cf. Univ. of Tex. Med. Branch at Galveston v. Hohman*, 6 S.W.3d 767, 775 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.) (holding when it is unclear whether the employer has any post-termination grievance procedure or it is unclear what the procedure is, terminated employees who timely invoke grievance procedure have adequately tolled the limitations period); *Beiser v. Tomball Hosp. Auth.*, 902 S.W.2d 721, 724 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (stating limitations did not bar terminated employee's suit when communications with employer created uncertainty as to availability or applicability of grievance procedures).  Although a constructive discharge is equivalent to a termination under the Whistleblower Act,[6] this Court agrees with the City that this does not transform Gerardi's resignation into a termination for purposes of the

---

[6]*Hohman*, 6 S.W.3d at 772-73.

8

City's grievance procedures.  Because there is no evidence that the City created an ambiguity in its grievance procedures, Gerardi's attempt to appeal his retirement did not render his claim timely filed.  The City is entitled to summary judgment.


## IV. SUMMARY

Because there is no evidence that Van Laar had final policymaking authority in order to impose municipal liability and because Gerardi did not timely file his whistleblower claim, the City is entitled to judgment as a matter of law.

SIGNED June 7, 2006.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE